UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JODIE DORTMAN,

                  Plaintiff,              No. 04-CV-71858-DT

vs.                                   Hon. Gerald E. Rosen

ACO HARDWARE, INC.,

                  Defendant.
_____/

OPINION AND ORDER GRANTING
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____June 14, 2005_____

PRESENT:  Honorable Gerald E. Rosen
                United States District Judge

## I. <u>INTRODUCTION</u>

This FMLA/Workers' Compensation retaliation action is presently before the

Court on Defendant ACO Hardware, Inc.'s Motion for Summary Judgment.  Plaintiff has

responded to Defendant's Motion to which Response Defendant has replied.  Having

reviewed and considered the parties' briefs, supporting documents and the entire record

of this matter, and having heard the oral arguments of counsel on June 9, 2005, the Court

is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's

ruling.

1

## II.  PERTINENT FACTS

Plaintiff Jodie Dortman is a former employee of Defendant ACO Hardware, Inc. ("ACO").  ACO operates 64 retail hardware stores throughout Southeast Michigan. Plaintiff was employed by ACO for 17 years prior to the termination of her employment in December 2003.  Plaintiff worked at ACO Store #129 in Port Huron from 1987 until that store was closed in a company-wide consolidation in February 1997.  Plaintiff then voluntarily transferred to Store #112, which was also located in Port Huron, where she worked until her termination.

ACO Hardware has a Family and Medical Leave of Absence policy which is set forth in the Company's Employee Handbook.  *See* Defendant's Ex. 1.  The policy states that an employee may take "up to twelve weeks of unpaid leave during any 12 month period, measured backward from the date that the employee uses any FMLA leave." *Id.* at p. 52 and Appendix A at p. 71."  As explained in Appendix A of the Employee Handbook,

> ACO will measure the twelve-month period as a "rolling" twelve-month period measured backward from the date of the requesting employee's leave.  Each time an employee takes leave, ACO will compute the amount of leave the employee has taken under this policy and subtract it from the twelve weeks of available leave, and the balance remaining is the amount the employee is entitled to take at that time.

*Id.* at p. 71.

Plaintiff signed a Receipt acknowledging her receipt of the Employee Handbook, and Plaintiff testified in her deposition that she understood the Company's FMLA policy.

2

[*See* Plaintiff's Dep., p. 109.]

From 2000 through 2003, Plaintiff had a variety of health problems and she took FMLA medical leave on six occasions during this period.  On each occasion that Plaintiff requested leave, ACO granted the leave and gave Plaintiff the "U.S. Department of Labor Employer Response to Employee Request for Family or Medical Leave" form with all of the statutorily-required information.  *See* Defendant's Exs. 4-9.[1]  Plaintiff's medical leaves were as follows:

1.      Leave for Arthroscopic Knee Surgery -- 9/28/00-10/17/00.  Plaintiff requested and was granted FMLA leave for arthroscopic surgery of her left knee.  *See* Defendant's Ex. 4.  This leave was from September 20, 2000 through October 17, 2000.  Plaintiff testified that she had no problems returning to work after this leave. [Plaintiff's Dep. p. 114.]

2.      Leave for Gallbladder Surgery -- 6/14/01 through 8/19/01.  Plaintiff again took FMLA leave on June 14, 2001.  *See* Defendant's Ex. 5.  She returned without incident on August 19, 2001. [Plaintiff's Dep., pp. 114-15.]

3.      Leave for Partial Hysterectomy -- 10/22/01 through 12/3/01.  Plaintiff again applied for FMLA leave in October 2001 for a partial hysterectomy.  *See* Defendant's Ex. 6.  This leave lasted until December 3, 2001.  *Id.*  Plaintiff returned to work after this

---

[1]  ACO offers its employees Short Term Disability benefits and during five of Plaintiff's six FMLA leaves, pursuant to ACO's Short Term Disability plan, in addition to leave time she received 60% of her pay.

3

leave with a temporary ten-pound weight restriction, which was accommodated by ACO through its conclusion in early January 2002. [Plaintiff's Dep. pp. 116-17.]

4.      Leave for Hemorrhoid Surgery -- 1/31/03 through 2/17/03.  A year after returning from her leave for her partial hysterectomy, Plaintiff again requested and was granted FMLA leave from January 31, 2003 through February 17, 2003 for hemorrhoid surgery.  *See* Defendant's Ex. 7.  (Although Plaintiff originally returned to work the Monday following her surgery, she obtained a note from her doctor stating that she was unable to work for the next two weeks because she said she could not lift anything and had to take spitz baths several times per day. [Plaintiff's Dep., p. 122.])

5.      Leave to Recover from On-the-Job Injury -- 3/19/03 through 4/21/03.  On March 9, 2003, Plaintiff suffered an on-the-job injury (diagnosed as a "contusion/ sprain") when some shelves in a storage room fell on her right arm.  Plaintiff filed a workers' compensation claim which ACO did not dispute and the company paid all of her medical and wage benefits as a result of this injury.  As with her previous leaves, ACO issued Plaintiff an "Employer Response to Employee Request for Family or Medical Leave" form, which clearly advised Plaintiff that "The requested leave will be counted against your annual FMLA leave entitlement."  *See* Defendant's Ex. 8, ¶ 2. Although Plaintiff originally had requested only one week of leave following her on-the-job injury, she testified that the injury continued to be very painful, and as a consequence, she chose to discontinue the physical therapy prescribed by her doctor, and remained on

4

leave until April 21, 2003. [Plaintiff's Dep. pp. 53-54.][2]

Plaintiff claims that when she returned from her worker's compensation leave on April 21, 2003, she was "demoted" because she was put in the position of Head Cashier instead of Department Manager of Tools and Hardware. *Id.* at 79.  However, the certificate provided to ACO by Plaintiff's treating physician releasing Plaintiff to return to work placed a weight limitation restriction on her -- Plaintiff was not to lift anything heavier than five pounds.  *See* Defendant's Ex. 12.  Plaintiff could not have performed any of the duties of a Department Manager with a five-pound lifting restriction, except for operating the cash register.  *See* Affidavit of Store Manager Paul Bartle, ¶¶ 4-5. Plaintiff testified that as Department Manager, she regularly carried 60-pound bags of cement and sand, 20 to 40-pound bags of soil, 50-pound bags of marble chips and boxes of paint cans weighing 62 pounds. [Plaintiff's Dep., pp. 83-84.] Mr. Bartle testified that with a five-pound restriction, Plaintiff would be unable to carry or mix even one can of paint, which weighs seven pounds. [Bartle Aff., ¶ 5.]

Furthermore, Plaintiff admits that she suffered no loss of title, pay or benefits as a result of being assigned to the Head Cashier position. [Plaintiff's Dep., pp. 80-81.  *See also*, Bartle Aff., ¶ 4.]   In her deposition, Plaintiff testified that, although there were different responsibilities as a Head Cashier, the level of responsibility was "about equal"

---

[2]  Plaintiff claims that when she returned from her worker's compensation leave, her store manager, Paul Bartle, told her that she took too much time off on medical leave and that if she ever went on medical leave again he would fire her. [*See* Plaintiff's Dep. p. 79.] Bartle denies this. [*See* Bartle Aff., ¶ 3.]

to that of a Department Manager.  *Id.* at p. 80.

   6. <u>Surgery to Remove Ruptured Ovaries -- 8/27/03 through 12/1/03.</u>  Four

months after returning to work after her on-the-job injury, Plaintiff requested an open-

ended FMLA leave of absence on August 26, 2003 for removal of her ovaries.  *See*

Defendant's Ex. 9.  ACO's Employer Response form granting this leave request on

August 26, 2003 advised Plaintiff in large print: "NOTE: You have 26 days of FMLA

remaining."  *See id.*, ¶ 4.  Plaintiff admits she received this Employer Response form, but

does not remember if she noticed this notification. [Plaintiff's Dep., p. 132.]

   Plaintiff was not released by her physician to return to work until December 1,

2003.  *See* Defendant's Ex. 10.   However, Plaintiff's annual FMLA 12-week leave time

allotment expired on September 22, 2003.  Plaintiff did not communicate with her Store

Manager, Paul Bartle, at any time during this leave until November 2003, when Plaintiff

called Mr. Bartle asking about a schedule to return to work.  *See* Bartle Affidavit,

Defendant's Ex. 11, ¶ 6.  Bartle testified that he was surprised by Plaintiff's phone call so

he simply told her to report on December 1, 2003. *Id.*   Bartle stated that he had thought

that Plaintiff had taken more than 12 weeks of leave time and confirmed that belief with

ACO's Human Resources Director.  *Id.* at ¶ 7-8.  Human Resources also confirmed that

Bartle was not required under the FMLA to reinstate Plaintiff.  *Id.*   Bartle testified that

because it was the holiday season, he had hired additional cashiers and he did not want to

terminate any of them, which he would have to do to reinstate Plaintiff.  *Id.*  But, he did

not want to tell Plaintiff this over the phone and, instead, decided to wait until December 1, 2003 when she reported to work.  *Id.*

When Plaintiff reported on December 1, 2003, Bartle informed her that she was being laid off.  *Id.*  Eight days after her lay-off from ACO, Plaintiff obtained comparable employment at Lowe's where she apparently remains employed.[3]  Plaintiff testified that her duties, pay and benefits are nearly equivalent to her previous position at ACO. [Plaintiff's Dep. pp. 11-13.]

On March 31, 2004, Plaintiff initiated the instant action in St. Clair County Circuit Court.  In her Complaint, Plaintiff alleges three claims: In Count I, Plaintiff alleges a claim of "Retaliation in Violation of Public Policy for filing a Workers' Compensation Claim."  Plaintiff's Count II is similarly phrased as "Retaliatory Discharge in Violation of Public Policy for Exercising Family Medical Leave Act."  And in Count III, Plaintiff alleges a claim of slander.  This last claim is predicated upon Plaintiff's allegation that the Second Assistant Manager at store # 112, Melody Pesta, allegedly told other unidentified ACO employees that Plaintiff was falsifying her injuries in order to take excess time off work.  ACO timely removed the case to this Court on federal question (FMLA) grounds.  Discovery has now closed and ACO has moved for summary judgment on all of Plaintiff's claims.

## III.  DISCUSSION

---

[3]  Plaintiff was still employed at Lowe's at the time of her deposition on October 27, 2004.

7

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[4]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

---

[4]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

8

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also,*

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will

apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in

this case.


B.    PLAINTIFF'S "VIOLATION OF PUBLIC POLICY" CLAIMS ARE NOT
       COGNIZABLE UNDER MICHIGAN COMMON LAW

As an initial matter, as indicated above, Count I and Count II of Plaintiff's

Complaint purportedly state claims for public policy wrongful discharge.   However, as

the Court noted at the hearing on this matter, the law in Michigan is clear that a common

law public policy wrongful discharge claim is actionable *only* where there is no

9

applicable statutory prohibition against retaliatory discharge of an employee for exercise

of the statutory right.  *See Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 80, 503

N.W.2d 654 (1993).  In *Dudewicz*, the court held that:

> [T]he remedies provided by statute for violation of a right having no
> common-law counterpart are exclusive, not cumulative. . . .  The existence
> of the specific prohibition against retaliatory discharge in the [statute] is
> determinative of the viability of a public policy claim.  In those cases in
> which Michigan courts have sustained a public policy claim, the statutes
> involved did not specifically proscribe retaliatory discharge.  Where the
> statutes involved did proscribe such discharges, however, Michigan courts
> have consistently denied a public policy claim. . . .   A public policy claim
> is sustainable, then, only where there also is not an applicable statutory
> prohibition against discharge in retaliation for the conduct at issue.

443 Mich. at 78-80.

The FMLA prohibits both interference with, and retaliatory discharge for, exercise

of rights conferred by the statute.  29 U.S.C. §§ 2614(a)(1), 2615.  Similarly, the

Michigan Workers' Disability Compensation Act (the "WDCA") provides a remedy for

an employee who has suffered retaliation for exercise of rights under the Act.  M.C.L. §

418.310(11).

At the June 9, 2005 hearing on this matter, Plaintiff's counsel acknowledged the

lack of viability of Plaintiff's common law public policy theories and stated that Plaintiff

was only alleging claims of violation of the FMLA and the anti-retaliation provisions of

the WDCA.  Therefore, this Opinion addresses the merits of such claims.

C.    PLAINTIFF HAS FAILED TO MAKE OUT A CLAIM OF VIOLATION OF
      THE FMLA

Plaintiff claims that ACO terminated her in violation of the FMLA because her workers' compensation leave time should not have been included in her 12-week FMLA entitlement.  She further claims that she was never notified by ACO that her workers' compensation leave would be "offset" against her annual FMLA allotment.

Under the Family Medical Leave Act, eligible employees are entitled to up to twelve weeks of unpaid leave within a 12-month period for any one or more of the following reasons: (1) for the birth of a child and to care for that newborn child; (2) for the placement of a child with the employee for adoption or foster care; (3) to care for an immediate family members (spouse, child or parent) if that person has a serious health condition; or (4) because of a serious health condition that renders the employee unable to perform the functions of his or her position.  29 U.S.C. § 2612(a)(1).  The serious health condition can result from injury to the employee "on or off" the job.  Although FMLA leave is generally unpaid leave, employers may require that employees substitute paid leave, for any part of the FMLA leave.  *See* 29 C.F.R. § 825.207.  The Act further provides that it is an employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying leave, *see* 29 C.F.R. § 825.208, and specifically permits the designating of 12 weeks of workers' compensation time as FMLA leave.  *See* 29 C.F.R § 825.207(d)(2).

For purposes of determining the "12 month period" in which the 12 weeks of leave entitlement occurs, 29 C.F.R. § 825.200 provides that employers may choose to use

11

(1) the calendar year;  (2)  a "fixed" 12-month leave year, such as a fiscal year or a year

starting on an employer's "anniversary" date; (3) the 12-month period measured forward

from the date any employee's first FMLA leave begins; or (4) a "rolling" 12-month

period measured backward from the date an employee uses any FMLA leave.  29 C.F.R.

§ 825.200(b).  29 C.F.R. § 825.200(d) provides that employers may choose any one of

the alternatives in paragraph b, provided that the alternative chosen is applied

consistently and uniformly to all employees.  *Id.*    As indicated above, Defendant ACO

uses a "rolling" 12-month period.

First, with respect to the notice of workers' comp time being included within the

FMLA 12-week allotment, contrary to Plaintiff's assertions, she was specifically notified

on March 19, 2003 that her workers' compensation leave which began on that date would

be counted against her annual FMLA allotment.    The Department of Labor-sanctioned

"Employer Response to Employee Request for Family or Medical Leave" -- **which**

**Plaintiff admits receiving** -- specifically provided, in pertinent part, as follows:

> This is to inform you that:
>
> 1.      You are eligible . . . for leave under the FMLA.
>
> 2.      **The requested leave will . . . be counted against your annual FMLA**
>         **leave entitlement.**
>
> 3.      You will. . . be required to furnish medical certification of a serious
>         health condition. . . by 4/9/03. . . .
>
> 4.      . . .  We will. . . require that you substitute accrued paid leave for
>         unpaid FMLA leave [and] the following conditions will apply: . . .

> Worker's compensation rules apply first.  Personal/sick,
> vacation and birthday holiday will be applied after.  Balance
> of leave, if any, will be unpaid.

[*See* Defendant's Ex. 8.]

Plaintiff complains that the ACO Hardware Employee Handbook says nothing about off-setting FMLA leave time with workers' compensation leave time.  She claims that ACO's failure to mention offset of workers' comp leave time in the handbook constitutes a violation of the statute.  In support of this contention, Plaintiff cites.  *Loyola University Medical Center,* 1999 U.S. Dist. LEXIS 2790 (N.D. Ill. 1999), an unpublished district court decision from the Northern District of Illinois. [*See* Plaintiff's Ex. C.]  Not only is *Chan* not controlling precedent but also it is factually distinguishable from this case.  At issue in *Chan* was whether *oral* notification and a *blank* university FMLA Leave Request form given to the plaintiff while she was in the hospital constituted sufficient "written notification" that the plaintiff's paid sick leave time would count against her 12-week FMLA allotment.  The court found that although the oral notification and blank form suggested that Loyola had provided the plaintiff with some form of notice, the communications were sufficiently ambiguous to preclude summary judgment and, therefore, ordered the notice issue submitted to the jury.[5]

Here, we do not have merely a "blank" form, but rather a Department of Labor

_____

[5]  Plaintiff further ignores the fact that after issuing its decision in *Chan*, the court *sua sponte* reconsidered its ruling and ultimately decided that there was no question of fact for the jury.  *See Chan v. Loyola University Medical Center*, 1999 WL 1080372 (N.D. Ill. 1999) (granting reconsideration).

sanctioned form that was filled out by ACO's Director of Human Resources and

specifically made out to Plaintiff.[6]   Furthermore, the FMLA regulations grant employers

considerable flexibility as to the choice of form of the written notice required: "The

written notice may be in any form, including a notation on the employee's pay stub."  29

C.F.R. § 825.208(b)(2).  All that is required is that the employer supply written

notification, which was done in this case.

D.    <u>PLAINTIFF WAS NOT DISCHARGED IN VIOLATION OF THE STATUTE</u>

Plaintiff also claims that she was terminated from her employment because she

took too much FMLA leave time.  The FMLA declares it unlawful for "any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise any right

provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To bring a successful claim

under this Act, a plaintiff must show (1) that she engaged in conduct protected by the

Act, (2) that the defendant was aware of this exercise of protected rights, (3) that the

defendant took an employment action adverse to the plaintiff, and (4) that there was a

causal connection between the protected activity and the adverse employment action.

*Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450-51 (6th Cir.

2005).

––––––––––––––––––––

[6]  Significantly, it is worth noting that the form used by Loyola was NOT the
Department of Labor form used by ACO and the *Chan* court, in fact, specifically noted
that had Loyola used the Department of Labor form it would have constituted adequate
notice and enabled the court to find in favor of the defendant as a matter of law.  1999
U.S. Dist. LEXIS 2790, * 22 n. 10 (Plaintiff's Ex. C, p. 11).

An eligible employee who takes FMLA leave is, upon return from such leave, ordinarily entitled to be restored to her position or an equivalent position.  29 U.S.C. § 2614(a)(1).  There is no right to reinstatement, however, if the employee is unable to return to work at the end of her 12-weeks of allotted FMLA time.  29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including *the continuation* of a serious health condition, the employee has no right to restoration to another position under the FMLA."); *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784 (6th Cir. 1998); *see also Manns v. ArvinMeritor, Inc.*, 291 F. Supp. 2d 655,659 (N.D. Ohio 2003) (once an employee exceeds his twelve weeks (or sixty workdays) of FMLA leave, additional leave is not protected by the FMLA and the termination of the employee will not violate the FMLA); *Hicks v. Leroy's Jeweler, Inc.*, 225 F.3d 659, 2000 WL 1033029 *5 (6th Cir. 2000), *cert. denied*, 531 U.S. 1146 (2001) (an employee who cannot return to work at the end of the approved leave is not entitled to job restoration).

In this case, Plaintiff was notified in writing when she commenced her August 27, 2003 leave (for surgery on her ruptured ovaries) that she had only 26 days of FMLA leave time remaining.  *See* Defendant's Ex. 9, ¶ 4.[7]  Plaintiff's FMLA 12-week allotment

---

[7] Plaintiff contends that she had more than 26 days remaining as of August 27, 2003.  However, Plaintiff's calculations are based upon her contention that her workers' compensation leave time should not have been included in her 12-week FMLA allotment. As discussed above, Plaintiff is mistaken about her workers' comp time; Defendant properly included her time off for her workers' comp injury in her FMLA allotment.

15

expired on September 22, 2003.  However, Plaintiff was not cleared by her doctor to

return to work until December 1, 2003 and she made no attempt to do so prior to

November 2003.[8]  The time she was off work after September 22, 2003 was not covered

by the FMLA.  Therefore, Plaintiff cannot establish an essential element of a claim of

retaliatory discharge under the FMLA: *i.e.,* she cannot show that at the time of her

discharge, she was engaged in conduct protected by the statute.  ACO afforded Plaintiff

with the full twelve weeks of leave and took no FMLA-actionable adverse  employment

action against Plaintiff.  Simply stated, because Plaintiff did not return to work when her

FMLA leave time expired, she could be terminated at any time without violating the

FMLA.

---

[8]  ACO's Employer Response to Plaintiff's leave request specifically advised
Plaintiff that she was to provide ACO with periodic reports of her status and intent to
return to work, and if the circumstances of Plaintiff's leave were to change, such that she
was able to return to work earlier than originally anticipated, she was to notify her
employer at least two work days prior to the date on which she intended to return to
work.  *See* Defendant's Ex. 9, ¶ 8.  Plaintiff never notified ACO that she was able to
return to work prior to December 1, 2003.

16

E.    ACO DID NOT RETALIATE AGAINST PLAINTIFF UNDER THE
WORKERS' COMPENSATION ACT WHEN IT ACCOMMODATED HER 5-
POUND LIFTING RESTRICTION UPON HER RETURN FROM LEAVE.

Plaintiff also has asserted a claim of retaliation in violation of the Michigan

Workers' Disability Compensation Act.  In order to establish a *prima facie* case of

retaliatory discharge, a plaintiff must establish that:

1.    he asserted his right to workers' compensation benefits;
2.    the defendant knew that plaintiff asserted his right to workers'
compensation benefits;
3.    the plaintiff suffered an adverse employment action; and
4.    there was a causal connection between the plaintiff's assertion of his
right to workers' compensation benefits and the adverse employment
action.

*Chiles v. Machine Shop, Inc*., 238 Mich. App. 462, 470, 606 N.W.2d 398 (1999);

*Chisolm v. Michigan AFSCME Council 25*, 218 F. Supp. 2d 855, 873-74 (E.D. Mich.

2002).

The *McDonnell Douglas/Burdine*[9] burden shifting approach applies to workers'

compensation retaliation claims. *Chiles*, 238 Mich. App. at 470, 606 N.W.2d 398. Once a

plaintiff establishes a *prima facie* case, the *McDonnell Douglas* approach shifts the

burden to the defendant to articulate a legitimate, non-retaliatory reason for the adverse

employment decision. *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 143, 120

S.Ct. 2097(2000); *Carden v. General Motors Corp*., 156 Mich.App. 202, 211, 401

N.W.2d 273 (1987), *app. denied*, 428 Mich. 891 (1987). Once the defendant has met this

---

[9]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

17

burden of production, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [unlawful retaliation].'" *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citation omitted).

The burden is upon the employee to establish an illegal adverse employment action by the employer. *Chiles, supra*, 238 Mich. App. at 470. An "adverse employment action" is an action which "constitutes a significant change in employment status, such as hiring, firing , failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 797-98 (6th Cir. 2004). A tangible adverse employment action in most cases inflicts direct economic harm. *Id.* However, an adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Russell v. Bronson Heating and Cooling*, 2004 WL 225036 * 23 (E.D. Mich. 2004). "It must be a condition such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities. *Id.*, (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

In this case, Plaintiff claims that she was "demoted" from the position of Department Manager to Head Cashier when she returned to work following her workers'

18

compensation leave on April 21, 2993. [*See* Complaint, ¶¶ 25-31].  However, Plaintiff suffered no significant change in the terms or conditions of her employment when she was assigned to the Head Cashier's position.  Plaintiff admitted at her deposition that she suffered no loss of title, pay or benefits as a result of the reassignment. [Plaintiff's Dep., pp. 80-81.] She further testified that although she had some different responsibilities in the Head Cashier's position, the level of responsibility was "about equal" to that of the Department Manager's position.  *Id.* at 80.  Working as a cashier was simply one sub-set of the duties of Plaintiff's previous position of Department Manager, and Plaintiff admitted that she worked the register "quite a lot" when she was a Department Manager. *Id.* at 82.[10]

The foregoing makes clear that Plaintiff has not suffered an actionable adverse employment action.  Without this essential element, Plaintiff cannot make out a *prima facie* claim of retaliation.

However, even assuming *arguendo* that Plaintiff has made out a *prima facie* case of retaliatory demotion, ACO has articulated a legitimate non-retaliatory reason for its

---

[10]  Plaintiff has attempted to create an issue of fact regarding her claim that she was demoted by submitting an Affidavit along with her Brief in Response to Defendant's Motion for Summary Judgment which contradicts her deposition testimony.  It is well-settled that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  *See also Stuble v. T.A. Systems, Inc.*, 984 F. Supp. 1075, 1091 (E.D. Mich. 1997) (the court will not consider an Affidavit that contradicts prior deposition testimony when ruling upon a summary judgment motion).

19

decision to place Plaintiff in the position of Head Cashier upon her return from her

workers' comp leave:  Plaintiff's treating physician released Plaintiff to return to work

but only with a 5-pound lifting restriction.  *See* Defendant's Ex. 12.  Paul Bartle, the

ACO Store Manager at store # 112 where Plaintiff was employed, testified that with this

5-pound lifting restriction, Plaintiff would be unable to perform most of the duties of a

Department Manager of Tools and Hardware -- other than operating a cash register.

*See* Bartle Aff., ¶ 4-5.  Bartle testified that Department Manager duties include stocking

shelves, loading/unloading merchandise from trucks and/or into customer vehicles,

regularly lifting up to 25 pounds and occasionally lifting up to 50 pounds.  *Id.* at ¶ 5.

Plaintiff herself testified in her deposition that, as a Department Manager, she regularly

carried 60-pound bags of cement and sand, 20 to 40-pound bags of soil, 50-pound bags of

marble chips and paint cans in boxes weighing 62 pounds. [Plaintiff's Dep. pp. 83-84.]

Having articulated a legitimate non-retaliatory reason for reassigning Plaintiff to

the position of Head Cashier upon her return to work after her workers' comp leave, the

burden is upon Plaintiff to produce evidence that this reason is merely a pretext for

unlawful retaliation.  Plaintiff has come forward with no such evidence.[11]  Therefore,

---

[11]  Plaintiff suggests that retaliation can be inferred from the fact that the departments that she managed before her workers' compensation leave were "given away" to other employees before she returned to work and she was, therefore, never given an opportunity to transfer back into a department manager position after her weight restriction was lifted.  However, at her deposition, Plaintiff testified that she did not know when -- if ever -- her weight restriction was lifted and did not know whether she had ever presented anyone at ACO with anything from her doctor indicating a change in her medical restrictions. [Plaintiff's Dep., pp. 123-24.]

Plaintiff has failed to make out a cognizable claim of retaliation under the WDCA

predicated upon her "demotion" to the position of Head Cashier.

F.     PLAINTIFF HAS FAILED TO MAKE OUT A CLAIM OF RETALIATORY
       DISCHARGE UNDER THE WDCA

Plaintiff also claims that the termination of her employment on December 1, 2003

was the result of unlawful retaliation for filing a workers' compensation claim nine

months earlier.  The law is clear in Michigan that a plaintiff must demonstrate that the

filing of a workers' compensation claim was a "significant factor" in the adverse

employment action.  *Taylor v. General Motors Corp.*, 826 F.2d 452, 456 (6th Cir. 1987).

The plaintiff cannot make such a showing through offers of speculation and conjecture.

*See Kirkland v. Diecast Corp.*, 1998 WL 2016629 (Mich. App. 1999).

As indicated, Plaintiff here was discharged nine months after she filed a workers'

compensation claim.  Michigan law is clear, however, that something more than a mere

temporal connection is required to establish a causal connection between the filing of a

workers' comp claim and an adverse employment action.  *West v. General Motors Corp*,

469 Mich. 177, 186, 665 N.W. 2d 468 (2003).  Furthermore, the substantial length of

time that passed between Plaintiff's filing of her workers' comp claim and her

termination mitigate against a finding of causation.  *See e.g., Hafford v. Siedner*, 183 F.3d

506, 515 (6th Cir. 1999) (disciplinary action taken five months after filing civil rights

charge held insufficient to support a claim of retaliation); *Cooper v. City of North

Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("the mere fact that [plaintiff] was

21

discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation"); *Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116-17 (S.D. Ohio 1981), *aff'd*, 709 F.2d 1499 (6th Cir. 1983) (termination three months after filing a charge of discrimination "does not provide the inference necessary to establish a prima facie case of retaliation.")

Plaintiff's only other evidence of any correlation between her workers' compensation claim and her termination is her deposition testimony that when she returned from her workers' comp leave -- which was the ***fifth*** medical leave that Plaintiff had taken over a two-and-a-half-year period between September 2000 and March 2003 -- her Store Manager threatened to fire her if she were to take any further time off.  Even accepting Plaintiff's deposition testimony regarding what Mr. Bartle said as true, it still does not demonstrate that her workers' compensation claim was a significant factor in the decision to lay Plaintiff off when she did not return from a subsequent non-workers' comp medical leave after her 12-weeks of allotted leave time was exhausted.

Furthermore, even if Plaintiff has established a *prima facie* case of retaliation under the WDCA, ACO has articulated a legitimate non-retaliatory reason for her discharge: Plaintiff was terminated on December 1, 2003 because her leave time under the FMLA had expired.  As discussed above, this was a neutral function of ACO's FMLA policy and applicable law.  Furthermore, as indicated, it was the holiday season -- the busiest time of year for ACO -- and Plaintiff had already been replaced on the store

22

schedule to maintain appropriate staffing levels. [Bartle Aff., ¶ 7.] ACO was under no legal obligation to displace other employees to reinstate Plaintiff after expiration of her allowable leave time.

Since ACO had a legitimate non-retaliatory reason for its employment decision, Plaintiff is required to show that ACO's stated reason was a mere pretext for WDCA retaliation. Plaintiff here has failed to make this required showing.

For all of the foregoing reasons, the Court finds that Plaintiff's claims of retaliation under the FMLA and the WDCA fail as a matter of law. Accordingly, summary judgment will be entered in favor of Defendant on Counts I and II of Plaintiff's Complaint.

## G.    PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE CLAIM OF SLANDER

Plaintiff has also claimed that she was slandered by the Second Assistant Manager at Store # 112, Melody Pesta. This claim is predicated upon Plaintiff's deposition testimony that she was told by a former co-worker, Theresa Orr, that on one occasion after Plaintiff's termination, Ms. Orr overheard Ms. Pesta say to some other unidentified co-workers who were working on a pricing crew that Plaintiff falsified her injuries and paid her doctors off so that she could take excess time off work. [Plaintiff's Dep., pp. 89, 147-28.][12] Ms. Pesta is not named as a defendant in this action. Rather, Plaintiff seeks to hold ACO responsible for Ms. Pesta's alleged statements under a theory of *respondeat*

_____

[12] Ms. Pesta denies making any such statements. [Pesta Affidavit, ¶ 3.]

23

*superior.*

A corporation may be held liable for slander uttered by an agent while in the discharge of his duty as agent, and in relation to the matter about which his duty as agent permits or requires him to act, in the same way and to the same extent as an individual could be held liable for the same slander.  *Poledna v. Bendix Aviation Corp*., 360 Mich. 129, 139-140, 103 N.W.2d 789, 793-94 (1960).  An employer is not liable, however, if the employee makes an allegedly slanderous statement while engaged in the employer's work, but outside of his authority.  *Leitch v. Switchenko*, 169 Mich. App. 761, 765, 426 N.W.2d 804, 805-806 (1988).  *See also*, *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 341, 497 N.W.2d 585 (1993), *app. denied*, 444 Mich. 942 (1994).

In *Linebaugh,* the Michigan Court of Appeals found that the corporate defendant, Sheraton, was not liable for the plaintiff's claim of defamation that arose from a vulgar cartoon drawn by the plaintiff's manager, Rick Herring.  The Court held that the cartoon was not drawn in the discharge of Herring's duties as an agent for Sheraton, and even if Herring had drawn the cartoon while at work, it was not done in relation to a matter about which his duties as manager required him to act.  198 Mich. App. at 340-41, 497 N.W.2d at 588.

Similarly, in *Leitch v. Switchenko*, the court affirmed the lower court's grant of summary disposition in favor of the defendant's employer, Burroughs Corporation, finding that Burroughs was not liable for an allegedly defamatory letter written by

24

one of its employees on company letterhead because there was no evidence that the employee who wrote the letter was acting within the actual scope of her employment or that the letter was authorized by any of Burroughs' personnel. 169 Mich. App. at 766, 426 N.W.2d at 806.

Turning to this case, notwithstanding the tenuous hearsay-within-hearsay statement upon which Plaintiff Dortman bases her slander claim, even accepting the statement as having been made, as a Second Assistant Manager, Melody Pesta has no responsibility for evaluating or approving workers' compensation or medical leaves. [*See* Pesta Affidavit, ¶ 4.]  All requests for, and approval of, leaves are handled through ACO's corporate headquarters' Human Resources Department.  *Id.*  Plaintiff has not come forward with any evidence which suggests otherwise.  As in *Linebaugh* and *Leitch*, the statement allegedly made by Ms. Pesta was not made in relation to a matter about which Ms. Pesta's duties as Second Assistant Manager required her to act.  Therefore, the Court will enter summary judgment in favor of Defendant ACO on Plaintiff's slander claim in Count III of her Complaint.

25

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED and Plaintiff's Complaint, therefore, is DISMISSED, with prejudice.

Let Judgment be entered accordingly.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: June 14, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 14, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager